52 CCPA

Application of William G. BAIRD, Jr., Carl A. Lindstrom, Jr., Arthur L. Besse, Jr., and Donald J. D'Entremont.

Patent Appeal No. 7445.

United States Court of Customs and Patent Appeals.

July 1, 1965.

Supplemental Opinion Aug. 20, 1965.

Alvin Guttag, Washington, D. C. (C. Edward Parker, Cambridge, Mass., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and AL-MOND, Judges.

RICH, Judge.

This appeal is from the decision of the Board of Appeals of the Patent Office in application serial No. 817,246, filed June 1, 1959, by Baird, Jr., Lindstrom, Jr., Besse, Jr., and D'Entremont for "Method of Treating Polypropylene."

The application at bar is stated to be a continuation-in-part of application serial No. 713,848, filed February 7, 1958, by the same four inventors for "Method of Producing Film Having Improved Shrink Energy," now patent No. 3,022,-543, herein "Baird et al.," issued to W. R. Grace & Co., assignee, on February 27, 1962.

*The Issues*

This appeal presents three distinct issues: (1) double patenting in view of certain claims of Baird et al.; (2) the patentability of two claims over the following references:

Gerber     2,862,234     Dec. 2, 1958
Diedrich
   et al.     2,961,711     Nov. 29, 1960;

and (3) sufficiency of appellants' disclosure to support a group of claims copied, or substantially copied (under the practice authorized by Ex parte Card and Card, 1904 C.D. 383 (Com'r.); see MPEP 1101.02), from

Munt     3,059,991     Oct. 23, 1962.

Involved in the double patenting issue are claims 2, 3, 6–11, 13, 14, and 15. On the second issue only claims 32 and 33 are involved. On the third issue the abbreviated record and the briefs leave the situation in some confusion. Apparently, guessing from what the record shows, appellants inserted a group of copied or substantially copied claims numbered 16–33. The examiner's final rejection rejects claims "16–23" as "lacking basis in the disclosure." It also refers specifically, in the discussion, to claims 17, 18, 19, 25, and 27, and then to claims 23–33. It would appear that the examiner intended to reject claims 16–33 as in his answer, following appeal to the board, he said the appeal involved the right to make claims "16–33." The board, in its opinion, made it clear beyond question that it was dealing with and affirming a rejection of claims 16–33 on the ground of lack of support.

The situation involves the further complication that the board made a new ground of rejection under Rule 196(b), ground (1) supra, the applicants then went back to the examiner under that rule, and took a second appeal to the board from his action. The board rendered a second decision but, before it did so, an appeal on claims 16–21 and 24 and raising only the sufficiency of disclosure issue had been taken to this court on

December 30, 1963. After the second decision of the board on other claims a second appeal was taken to this court on February 26, 1964. The latter appeal was stated in the notice of appeal to be an appeal on claims 2, 3, 6–11, 13–15, 32 and 33. At that time claims 32 and 33, as part of the claim group 16–33, were under rejection on all of the grounds (1), (2), and (3) above enumerated. The first appeal to this court makes no mention whatever of claims 32 and 33. The second appeal, while taken on these claims, along with eleven others, is very specific in pointing out the alleged errors of the board and includes, in the seven reasons of appeal (numbered 11 through 16 in supplementation of reasons 1 through 9 of the first appeal), only matters relating to the prior art rejection, (2) above, and the double patenting rejection, (1) above. There is no reason of appeal which, by the most liberal construction, indicates in any way, even generally, that the board erred in affirming the rejection of claims 32 and 33 for lack of support in appellants' specification, (3) above. It is therefore clear that appellants have not brought that ground of rejection before us by *any* reason of appeal. In addition, appellants have not argued *this* rejection in their brief insofar as claims 32 and 33 are concerned. That this is so is very clear from the facts that in reciting the "questions presented" those two claims are not included among those rejected for lack of support and in the "summary" they are not included among the claims as to which we are asked to reverse the lack of support rejection. Appellants argue the other two rejections of claims 32 and 33 but appear to have overlooked the fact they were rejected on the ground of lack of support.

When an examiner's ground of rejection, affirmed by the board, is not argued by the appellant, even if raised by an adequate reason of appeal, this court has uniformly pursued the policy of treating the issue as abandoned. In re Krasnow, 166 F.2d 196, 35 CCPA 939. See also In re Gruschwitz, 320 F.2d 401, 50 CCPA

1498, and cases cited in the appendix thereto. For this reason the rejection of claims 32 and 33 would have to be affirmed, one uncontested ground of rejection being sufficient to support such a holding. Anticlimactically, we will add that at the oral argument appellants' counsel advised that he was withdrawing claim 32 from the appeal.

We also add that the Patent Office brief argues throughout for affirmance of the rejection of claims "16–33" notwithstanding that, aside from the above facts respecting claims 32 and 33, appellants never gave notice of appeal from the rejection of claims 22, 23, 25, 26, 27, 28, 29, 30, or 31 nor mentioned any of them in their brief which was served on the Patent Office. Lack of attention on the part of both parties to these annoying mechanical details of legal procedure has made much work for the court which should not have been necessary and should have been done by counsel long ago.

The foregoing disposition of claims 32 and 33 makes it unnecessary to consider issue (2), supra, or the two prior art patents involved in it. Left for consideration are the double patenting and lack of support issues which require an understanding of the invention.

### The Invention

All claims are directed to a method or process of stretch orienting *polypropylene*. Material so made has various uses such as films for the wrapping of foods and other materials, shrinking bags, bottle caps, and boiling water-resistant containers, such as baby bottles. The stretch-oriented articles of the invention are said to have high shrink energy at temperatures above 145° C. with a percent shrink of from 20 to 60% but to have a low shrink percentage at 100° C. In illustrative use given in the parent patent is a bag made from tubing, placed around a turkey and shrunk around it by heating to form a packaged product. A general outline of the process as described in the parent patent is that *polyethylene* is heated and extruded into tubular form following which these four steps take place: (1) cooling to a low enough temperature to permit handling, which may be about room temperature, (2) *irradiating* at a dosage of at least $2 \times 10^6$ REP, (3) reheating the irradiated material enough so it will stretch without breaking and bilaterally stretching it by inflating it into a bubble, and (4) cooling in the stretched condition to a form-retaining temperature. Such material, when sufficiently reheated, shrinks as above indicated. The parent case, after describing the processing of polyethylene, says, "there can also be used in the process of the invention solid polypropylene" and certain other named polymeric materials not important here. The parent specification also states that the process can be applied to polyethylene with omission of the irradiation step and gives a specific example of such a process. There follows the statement that "With polypropylene it has surprisingly been found that high shrink energy can be imparted without the use of irradiation and with only racking [the inflating step after reheating the extruded article] although both hot blowing [upon extrusion] and racking can be employed if desired." There is then given "Example C" which is identical with "Example 1" of the application at bar and describes the processing of polypropylene by extruding a tube with simultaneous longitudinal stretch, cooling, reheating in a hot bath from which the tubing emerges in the form of an enlarged bubble which produces bilateral stretching by reason of inflation, and cooling the stretched product.

The application at bar, as a continuation-in-part, appears to have been filed voluntarily about 16 months after the parent application, with which it was copending for about two years and eight months. It incorporates that part of the parent specification relating only to polypropylene and its bilateral or biaxial orientation *without* irradiation. An additional example has been added and perhaps other data on details, not pointed

out to us, which are not to be found in the patent.

While the examiner pointed out in an argument that the application for the patent at one time contained a claim (not of record) directed to the orientation of polypropylene without irradiation, no such claim appears in the issued patent. Appellants' counsel asserts it to be his belief that it would have been improper to include claims to the processing of unirradiated polypropylene in the application with the processing of irradiated materials. In any event, he divided the claims between the two copending applications on the basis of including or excluding the irradiation step and prosecuted them simultaneously.

The examiner made no double patenting rejection. A year and eight months after the patent issued, when the application at bar was on appeal to the board on other rejections, the board made it sua sponte. We turn now to its consideration.

### The Double Patenting Rejection

This rejection stands against claims 2, 3, 6–11, 13–15, 32 and 33. It originated with the board under Rule 196(b) in an opinion of October 31, 1963, and was based on claims 1, 6, and 7 of Baird et al. patent in view of claim 8 thereof. Under said rule, appellants appear to have elected reconsideration by the examiner and then amended their claims to define the method as "consisting of" rather than "comprising" in order to meet one of the board's arguments. Their purpose was to so word the claims as to exclude from the claimed method even the possibility of using irradiation. The examiner rejected the thus amended claims on the ground of double patenting and they came back to the board on a second appeal. In an opinion of February 19, 1964, the board expressed complete agreement with the examiner's double patenting rejection.

As outlined above, the Baird et al. patent specification describes the bilateral stretch orientation of polyethylene both with and without the step of irradiation. It would appear that with polyethylene irradiation is necessary to obtain good results. The patent also describes the same method applied to polypropylene, with or without irradiation, but with this material irradiation appears not to be important and, "surprisingly," good results are obtained without it.

The method *including* irradiation, as applied specifically to polypropylene, is claimed in patent claims 1, 6, and 7. In claim 1, polypropylene is one of a Markush group of polymeric materials to which the method can be applied. Claim 6 is specific to polypropylene and claim 7 depends therefrom. Claim 6 of the patent reads:

6. A method of producing polypropylene film having improved shrink energy comprising (a) continuously extruding a tube of the fused polypropylene, stretching the polypropylene while above room temperature in at least one direction, (b) cooling the tube, (c) irradiating the tube with electrons at a dosage of at least $2 \times 10^6$ REP, (d) heating the irradiated tube to a temperature of at least 65° C. while the tube is in a heating zone comprising a bath of an inert liquid, (e) introducing and maintaining gas pressure in said heated tube between constricting means and a pair of opposed pressure means in sufficient amount to fill the tube and establish internal pressure to distend the tube at least 100% in a lateral direction in the section of the tube immediately adjacent to the heating zone, and (f) acting on the tube by said opposed pressure means at a differential rate to stretch the tube at least 100% in a longitudinal direction, from 50 to 95% of the expansion of the tube taking place in the liquid, and cooling prior to release of stretching tension.

Attention is directed to step "(c)", irradiation, which is a limitation in each of the patent claims, including those directed to the treatment of polypropylene.

It is the key factor in the double patenting issue. For comparison, claim 2 of the application follows and it will be seen that there is no irradiation step in it:

> 2. A method of producing biaxially oriented polypropylene consisting of heating polypropylene which has been stretched 50 to 500% longitudinally to a temperature of not lower than 25° C. below the crystalline melting point thereof and then simultaneously bilaterally stretch orienting the hot polypropylene and cooling prior to release of stretching tension, said bilateral stretch orienting being to an extent of 100 to 900% in each direction.

To summarize the views of the board as stated in its two opinions, they are that the principal difference between the application and patent claims is the inclusion or omission of the irradiation step; that the *patent specification* teaches that step to be not essential to the method when polypropylene, as distinguished from polyethylene, is treated; that the *patent specification* contains specific examples directed to polypropylene which do not include irradiation; that it is proper to look to the specification to determine the significance of the irradiation step under In re Greenlee, 222 F.2d 739, 42 CCPA 926; and that omission of irradiation in the application claims does not render them claims to an invention separate from or patentably different from the patent claims, citing Smith v. Kingsland, 85 U.S.App.D.C. 284, 178 F.2d 26 (D.C.Cir.1949).

■ The solicitor's brief goes further and asserts that "Since the irradiation step is unnecessary with polypropylene, the appealed claims are drawn to the same invention as the patent claims." He also refers to two prior art patents on the basis of which he argues that "it would be obvious to omit the irradiation step of the patent claims." We are disregarding this obviousness argument *based on prior art* since careful study of the two board opinions and the relevant examiner's answer reveals no argument that the omission would be obvious *on the basis of prior art,* in support of the double patenting rejection. This would be a new ground of rejection which the solicitor will not be heard to make in this court.

■ In our view, the patent and the application do not claim the *same* invention. They claim two different inventions. The patent claims a method comprising, in claim 6, six steps, step (c) being irradiation. The other patent claims are similar and need not be separately analyzed. They all include irradiation. The application claims omit the irradiation step, whatever other similarities may exist, and hence the claimed method is *different.* It cannot be said that the method of steps ABCD is the *same* method or invention as one consisting only of steps ACD or ABD. So much for the solicitor's argument that the inventions claimed are the same. See In re Zickendraht, 319 F.2d 225, 50 CCPA 1529, attention being directed to the writer's concurring opinion which contains much of relevance to the instant case.

■ The next question we must consider is whether the difference, due to the inclusion or omission of irradiation, is a difference, adequate to warrant the issue of a second patent or, as it may otherwise be stated, whether the application claims are patentable over the *claims* of the patent. This problem may also be stated to be whether it would have been obvious to one of ordinary skill to modify the process of the patent claims by eliminating the irradiation step. In considering this question it must be carefully remembered that by reason of the copendency of the application at bar and the application for the patent, the patent disclosure is not "prior art" and cannot be looked to for what it teaches. Under the Greenlee case it may be looked to to find

out what the terms of the claims *mean*[1] but that is all.

It appears to us that the examiner and the board came to the conclusion that the omission of irradiation in the stretch-orienting of polypropylene is a difference of no patentable significance, or an obvious omission, or a difference which did not make the application claims "patentable over" the patent claims only on the basis of disclosure in, or knowledge gained from reading, the patent specification. They thus came into possession not only of the knowledge on which the patent claims are based but of the knowledge on which the appealed claims are based. On this basis they became aware of the fact, not known to the art so far as the record shows, that irradiation is not essential to the method when applied to polypropylene, that analogous results are obtained with that material whether or not it is irradiated, and of the specific examples which are used to illustrate the method of the claims on appeal, which do not include irradiation. It is only on the basis of these facts that the conclusion was reached that omitting irradiation does not make a "patentable" difference. But it is not permissible to rest the legal conclusion on this issue on knowledge thus gained from what is not "prior art." The situation is indeed analogous to that in In re Ruff, 256 F.2d 590, 45 CCPA 1037, as alleged by appellants, in which case we held that equivalence *taught by an applicant* but not known to the art could not be used to reject his claims on the ground of equivalency with prior art. Here, in effect, the Patent Office position is that there is an equivalency in the method of processing irradiated and unirradiated polypropylene *because appellants discovered it and disclosed it in their patent specification.*

■ Once the *meaning* of the claims has become clear, if the disclosure of the patent specification is removed from consideration entirely, as it must be, no support remains for the arguments for double patenting and that rejection falls.

■ The board twice relied on the case of Smith v. Kingsland, supra. While the opinion in that case seems to deal with "double patenting," a little study will show that it was not really a double patenting case at all, at least not of the type we have here where rejection is based on patented *claims* and the applications were *copending* so as not to be available as prior art references. We see no value in it as a precedent. The reference there was a patent previously issued to the applicant Smith on a tobacco barn heater very like what he was claiming, but his patent issued in 1936 and his appealed application was filed six years afterward in 1942. Patentability depended on the obviousness of omitting a screen from his patented structure and the patent specification, which had long been "prior art" in the public domain at the time he filed, expressly taught that use of the screen was optional. It is difficult to see why the court found it necessary to devote such a lengthy discussion to the problem of patentability or to discuss so many extraneous issues. It could have rested solely on its express finding early in the opinion that the claims "were anticipated in the specification of the patent granted in 1936." Of course, in that situation the entire specification of Smith's patent was open to consideration, but that is not the case here. The only "double" patenting aspect of the case is that the prior art reference was Smith's own patent, but it was true "prior art."

The solicitor's brief makes the final argument that

\* \* \* the double patenting rejection is sound because appellants should not be allowed claims in a

---

1. In that case the specification was considered to see what was meant by the expression in the claims "boron trifluoride catalyst(s)" and to determine whether it would include an addition product of boron trifluoride and an amine, in other words to find the *scope* of the patent claims, not the obviousness or essentiality of elements in claims of the application.

second patent which add nothing to the sum of useful knowledge. The process claimed by appellants is the same as that claimed by the Baird et al. patent, or at most an obvious modification thereof, and the appealed claims add nothing to the sum of useful knowledge.

It is not the function of *claims* to add to knowledge but rather to define the scope of patent monopolies. If we assume the solicitor's intent was to use the term "claims" to mean *inventions,* then we have already pointed out that the premises underlying the conclusion lack factual foundation; the process claimed is not the *same* as that claimed in Baird et al. and it is not an *obvious* modification thereof. What has been added to the sum of useful knowledge here is the novel subject matter disclosed in the patent application which the solicitor seems erroneously to assume we can regard as prior art against the application at bar notwithstanding the copendency. One reading only the patent *claims* will have a hard time finding out that one can omit the irradiation step from any or all of the methods claimed and still get a satisfactory product.

Finally, we note that the methods described and claimed in the appealed claims obtain no protection from any of the patent claims because, by well-established principles of patent law, omission of the irradiation step from the processes claimed in the patent would avoid infringement. It is equally true that the practice of any of the methods of the patent claims would not infringe any of the appealed claims because they are all so limited by the words "consisting of" that inclusion of irradiation in the method would avoid infringement, according to the same principles.

The double patenting rejection is reversed.

### The Insufficient Disclosure Rejection

The remaining claims against which the rejection based on lack of support stands are 16–21 and 24. They are copies or modified copies of claims of the Munt patent No. 3,059,991. Appellants seek an interference. It is well to bear in mind the conditions to be met in copying claims for the purpose of invoking an interference as set forth in Patent Office Rule 205 (our emphasis):

205. *Interference with a patent; copying claims from patent.* (a) Before an interference will be declared with a patent, the applicant must present in his application, copies of all the claims of the patent *which also define his invention* and such claims *must be patentable in the application.* If claims cannot be properly presented in his application owing to the inclusion of an *immaterial* limitation or variation, an interference may be declared after copying the claims excluding such *immaterial* limitation or variation.

The position of the Patent Office is that there are material limitations in Munt's claims which do not find support in appellants' application. In some respects the situation varies from claim to claim and there are some limitations common to claims 16–21 and 24.

Munt discloses primarily a process of making brush bristles from isotactic polypropylene which is melt-extruded in the form of a "filament," immediately quenched in a cooling bath, gradually reheated in an oven as the filament passes back and forth over rolls, stretched only longitudinally to several times the original length, again quenched and then stored on a reel. From the monofilament thus produced bristle lengths may be cut. One illustrated variant is the production of a ribbon or tape instead of a filament.

Claim 16 is a copy of Munt claim 1 and reads:

16. A method of making an oriented filamentary article of isotactic polypropylene which comprises melt extruding a filament of said polymer, immediately immersing and quenching said extruded filament in a bath of a non-solvent liquid for said polymer at a temperature of from about 40° F. to at least as low

as about 60° F., then heating said quenched filament to a temperature within its softening range and longitudinally stretching said heat-softened filament.

The Patent Office says appellants do not have support for the claim limitation to "filament" and we agree. Appellants have a somewhat tortuous and we believe fallacious argument to meet this objection, while practically admitting they do not disclose "filaments." They say some filaments are hollow, that there is an unofficial subclass, 18–54H, directed to them in the Patent Office search files, and they have extracted from that subclass 18 U.S. patents which they have included in the record. We will concede they show hollow filaments or threads for the textile art, but appellants disclose no such hollow filaments. They admit their application discloses tubing and the fact is that it is tubing of substantial diameter, from half an inch minimum when extruded to several feet when inflated for stretching. To practice their bilateral stretch process they must have a tube which they can inflate. No showing has been made of inflation of a filament or that it can be inflated. The argument is that though Munt concededly shows only solid filament, or ribbon, a filament can be hollow and thus be a tube and therefore appellants' disclosure of tubes is a disclosure of filament. The fallacy is clear; the false syllogism is that because *some* filaments are tubes therefore all tubes can be called "filaments." We reject the argument and hold that appellants' application lacks support for "filament" or "filamentary article." For like reasons we agree there is no support for "ribbon shaped" and "ribbon" in claims 19 and 21.

Claim 16, supra, and all others of this group, call for "immediately" quenching the melt-extruded article. If we construe this according to Munt's disclosure, it is clear that this step is performed in advance of the stretching step which he employs. Appellants' disclosure is that the melt-extruded tubing is substantially *stretched* immediately upon issuing from the extruder, notwithstanding it goes into a cooling bath. It is drawn down into the bath by driven rolls at a speed of withdrawal "usually 100 to 600% greater than the speed of the polymer at the [extrusion] die face * * *." In our opinion, appellants and Munt teach in opposite directions as to this initial phase of the process and appellants lack reasonable support for the "immediate" quenching step of the copied claims.

All claims under this rejection specify a first quench bath temperature range of "from about 40° F. to at least as low as about 60° F." or the equivalent. Munt has a specific reason for the 60° F. maximum. Above that quench temperature his *finished* bristle filaments curl. His 40° lower temperature range limit is a "practical" limit determined by the brittleness of the polypropylene at this stage. He has seen fit to limit his claims to this range. Appellants have not shown a basis for claiming this *range*. Appellants' brief states the alleged support to be in disclosure of quenching to a temperature between 0° and 80° C. (32° and 176° F.). This is clearly no support for the specific range taught and claimed by Munt and included in all copied claims. Neither is there support by reason of appellants' disclosure, in a specific example, of a specific temperature of 7° C. (44.6° F.). In re Rodman, 223 F.2d 281, 42 CCPA 951, In re Draeger, 150 F.2d 572, 32 CCPA 1217.

Upon review of the record, we are disposed to agree with the general statement of the board, expressing agreement with the view of the examiner, that the copied claims "are drawn to an invention different from that disclosed in the specification." The lack of support rejection of claims 16–21 and 24 will therefore be affirmed.

### Conclusion

The appeal on claim 32, having been withdrawn, is dismissed.

The rejection of claim 33 on the ground of lack of support, not having been properly raised or argued, is affirmed for that reason.

The rejection of claims 16–21 and 24 on the ground of lack of support is affirmed on the merits.

The rejection of claims 2, 3, 6–11, and 13–15 on the ground of double patenting is reversed.

Modified.

## SUPPLEMENTAL OPINION ON APPELLANTS' MOTION RELATING TO CLAIM 33

After the handing down of our opinion in this appeal on July 1, 1965, appellants moved to have us clarify and, if necessary, reconsider our opinion and pass on the merits of the rejection of claim 33 on Gerber or Diedrich et al. With the motion there were filed certified copies of amendments of November 4, 8, and 13, 1963, and an office action of December 5, 1963, in response thereto, not previously of record.

The aforesaid office action is the examiner's final rejection following the first decision of the Board of Appeals of October 31, 1963, wherein the new rejection was made and after which appellants elected to return to the examiner under Rule 196(b). The amendments were part of that proceeding.

These papers from the file's history now belatedly establish to our satisfaction that the rejection of claim 33 on the ground of insufficient support, which we believed to be outstanding, was withdrawn by the examiner in view of amendments to claim 33. This explains why appellants took no appeal from such rejection. It also necessitates withdrawal of our affirmance of such supposed rejection, since it did not exist when the appeal to this court was taken.

While we reiterate that it was the duty of counsel for *both* sides to have made these facts clear to us and to have made sure that a record sufficient to show the essential facts was before us prior to hearing, we are nevertheless unwilling to rest any part of our decision on a supposed fact situation shown not to exist. This belated supplementation of the record has made even more work for the court and is not adequately excused by the statement that the omissions from the record were "inadvertent."

The Patent Office likewise was at fault in arguing, as we pointed out in our opinion, for affirmance of the rejection of claims 22, 23, and 25–31, though appellants took no appeal thereon, it now appearing from the added amendment that those claims had all been canceled prior to the first notice of appeal. The solicitor should have taken appropriate steps to add to the record to show this fact instead of arguing non-existent issues. The prima facie discrepancies which we observe were sufficient to put him on notice. He had possession of the full record. We did not have.

In a memorandum on this motion, the solicitor seeks to disclaim any responsibility for bringing before us the necessary parts of the record and suggests our adherence to an opinion predicated in part on what he now knows to be an erroneous view of the facts.

We wish to make it clear that we will not knowingly deal with imaginary issues such as the patentability of canceled claims nor with rejections which the Patent Office has withdrawn, and that when the solicitor is on notice of such situations we consider it to be his duty to move to make such additions to the record, in accordance with our rules, as may be necessary to show us what the facts are. This duty is not affected by the fact that the rules require appellants in the first instance to produce the record. Appellants are no more blest with perfection than is the Patent Office and so procedures are provided for adding to deficient records. We are not here to play games and we expect those procedures to be utilized to the end that we may make just decisions.

We now make the following disposition of claim 33:

1. Our affirmance of its non-existent rejection on the ground of lack of support is withdrawn.

2. We reaffirm the inclusion of claim 33 with those claims under rejection on ground (1), double patenting, and now

expressly include it with the claims whose rejection on that ground is reversed.

■■■ 3. Being now obliged to consider the rejection of claim 33 on Gerber or Diedrich et al., issue (2), we hold that those two prior art patents fail, singly or collectively, to render obvious, within the meaning of 35 U.S.C. § 103, the process defined by claim 33.

4. In place of the affirmance of the rejection of claim 33 we substitute a reversal of its rejection. In all other respects our opinion and decision of July 1, 1965, are adhered to.

WORLEY, C. J., took no part in the consideration or decision of this Supplemental opinion.